IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Central Ohio Gaming Ventures, LLC,

    Plaintiff,

  v.                        Case No. 2:11-cv-223

                              JUDGE JAMES L. GRAHAM
David Goodman, et al.,        Magistrate Judge Kemp

    Defendants.

OPINION AND ORDER

## I. Introduction

    This case relates to the proposed construction of a casino on property located at 200 Georgesville Road on the west side of Columbus, Ohio. Central Ohio Gaming Ventures, LLC (a wholly-owned subsidiary of Penn National Gaming, Inc.), an entity involved with the construction, filed suit in the Court of Common Pleas of Franklin County, Ohio, on March 4th of this year asking that the Ohio Department of Commerce (through its Superintendent, David Williamson, and its Director, David Goodman) be enjoined from releasing to the public certain documents which Central Ohio Gaming had submitted in conjunction with the building plans and applications for the casino. The complaint asserts that these documents contain trade secrets and are exempt from the public disclosure provisions of the Ohio Public Records Act, Ohio Rev. Code §149.43. Central Ohio Gaming simultaneously moved for temporary restraining order and preliminary injunction against disclosure. The trial court granted a TRO and set the preliminary injunction hearing for March 29, 2011.

    Although the issue of whether documents are or are not public records as the Ohio General Assembly has defined that term may seem to be one particularly appropriate for resolution by the

state courts, and although the two defendants named in the complaint are both officials of the Ohio Department of Commerce, Penn National, Central Ohio Gaming's corporate parent, removed the case to this Court a scant ten days after it was filed.  The removal petition contains this explanation of why that removal was proper and why, according to Penn National, this federal court has jurisdiction over the case.

The documents attached to the removal petition show that, on the same day the state court action was filed, the Dispatch Publishing Company was permitted to intervene in the case in order to assert an interest in the public disclosure of the documents.  After it did so, it filed an answer, cross-claim and counterclaim, asserting claims against Central Ohio Gaming and the two state official defendants, and also joining Penn National as an additional counterclaim defendant.  The subject of the counterclaim is not, however, related in any real sense to whether the records described in the complaint are public and subject to disclosure.  Rather, the Dispatch asserted claims which seek to enforce a commitment Penn National allegedly made to "The Dispatch, the City of Columbus, and the general public to annex the casino to the City and connect to Columbus water and sewer services."  Counterclaim, Demand for Judgment, ¶C.

In support of its claims, The Dispatch averred that, prior to the May 4, 2010 election, where one of the ballot issues was whether the Ohio Constitution should be amended to allow the casino to be built at the Georgesville Road site, Penn National said it would be annexing the site to the City of Columbus and would pay a substantial sum to the City for sewer and water services.  Apparently believing this to be a desirable result, the Dispatch provided both editorial and financial support for the referendum on that amendment.  It claims that Penn National has since refused to agree to an unconditional annexation of the

property and has announced plans to dispose of sewage generated from the casino's operation either directly on the site, or by trucking it elsewhere for disposal. As relief on this claim, the Dispatch seeks, among other things, an injunction against building any part of the casino that will deal with sewage disposal and an order directing Penn National to make good on its promise to proceed with the annexation of the property to the City of Columbus.

Following the lodging of the counterclaim, Central Ohio Gaming dismissed its complaint voluntarily and without prejudice under Ohio R. Civ. P. 41(A)(1)(a), leaving only the cross-claim and counterclaim pending for adjudication. The documents in question were then produced. Penn National, conceptualizing the current posture of the case as involving the Dispatch as the plaintiff, and itself and Central Ohio Gaming as defendants, notes that both it and its subsidiary are limited liability companies which are citizens of Delaware and Pennsylvania but not Ohio. It also asserts that the amount involved in the Dispatch's request for injunctive relief and attorneys' fees exceeds $75,000. Therefore, Penn National concludes, this Court has original jurisdiction over this case pursuant to 28 U.S.C. §1332(a) (diversity of citizenship) and the case was properly removed under 28 U.S.C. §1441(a). It does recognize in the removal petition that the case is not in the usual posture for removal, but asks the Court to disregard the procedural maneuvering in which the Dispatch engaged - namely, intervening in the case in order to assert a right to production of public documents, and then asserting an independent and unrelated counterclaim against two non-Ohio defendants simply in order to avoid removal - and to accept jurisdiction over the case.

II. <u>The Motions to Remand and to Realign Parties</u>

As one might imagine, the Dispatch neither shares Penn

-3-

National's view that it engaged in some type of procedural sleight-of-hand in order to obtain a state court adjudication of an otherwise removable case, nor that the case is, in fact, properly removable to this Court.  Three days after the notice of removal was filed, the Dispatch filed a motion to remand.  The motion lays out two separate reasons why removal is improper - first, that a counterclaim defendant such as Penn National is not, based upon the correct interpretation of the removal statute, a "defendant" and therefore cannot exercise a defendant's right to remove a case, and, second, that Mr. Goodman and Mr. Williamson remain as defendants to the cross-claim and their presence in the case destroys diversity of citizenship. Those defendants filed their own motion to remand on April 12, 2011, arguing that, at a minimum, the cross-claim should be remanded because the parties to that claim are not of diverse citizenship and because Messrs. Goodman and Williamson did not consent to the removal of that claim.

    Penn National has responded on two fronts.  First, it has opposed the motions to remand.  Second, at the same time it opposed the Dispatch's motion to remand, it moved for a realignment of the parties, which, if ordered as Penn National requests, would make the Dispatch the plaintiff and Penn National and Central Ohio Gaming the defendants.  Most of the memorandum in opposition to the Dispatch's motion to remand is focused on the "fraudulent position of the state court action" (Memorandum in Opposition to the Dispatch Printing Company's Motion to Remand, Doc. #10, at 3) and the "various flagrant improprieties in which [the Dispatch] engaged in order to create the procedural morass upon which it relies to defeat diversity jurisdiction." Id. at 2.  In brief, Penn National asserts that the only reason it ended up as a counterclaim defendant in the state court action (and therefore, according to the Dispatch, a party without a

-4-

right of removal), was that the Dispatch ignored state procedural rules concerning both the permissible scope of its intervention and the proper joinder of claims and parties. Because that is so, Penn National claims, that this Court should disregard the procedural posture of the state court case when it decides whether removal was proper. Finally, Penn National argues that the presence of the two state official defendants is simply irrelevant to the issue of jurisdiction because the dismissal of Central Ohio Gaming's complaint, followed by the release of the records in question, mooted any claims against them, and that the Dispatch's claim for attorneys' fees - premised on the state defendants' failure to disclose records subject to public disclosure under O.R.C. §149.43 - has also been mooted or lacks merit.

### III. Discussion

As the preceding statement of the case illustrates, there are three distinct issues which the Court may have to resolve: (1) may the Court realign the parties in such a way that the Dispatch becomes the plaintiff, and Penn National and Central Ohio Gaming become defendants; (2) may the Court disregard the procedural posture of the case in state court under the so-called "fraudulent misjoinder" doctrine, such as was done in Tapscott v. MS Dealer Service Corp., 77 F.3d 1353 (11th Cir. 1996); and (3) of what significance is the presence of the two state officials, Messrs. Goodman and Williamson, as defendants to the original complaint and as defendants to the Dispatch's cross-claim?  If, as the Dispatch claims, the Court must take the state defendants' presence in the case into account, and if their failure to consent to the removal and their status as non-diverse parties are sufficient to defeat removal jurisdiction no matter how the Court resolves the other two issues, it is logical to address that issue first. For the following reasons, the Court concludes

that even though the Dispatch has the better of this particular argument, it is not entirely dispositive of the question of jurisdiction, so that the Court also must address the applicability of the "fraudulent misjoinder" doctrine. As will be seen, however, on that argument, the Dispatch will also prevail, and that will necessitate the remand of this case to the state court.

### A. The State Defendants

Central Ohio Gaming's state court complaint named Messrs. Goodman and Williamson as the only two defendants. It appears that they were sued in their official capacities, since the relief sought was limited to an injunction against disclosure of the building plans at issue. Penn National does not appear to dispute the fact that state officials named in their official capacity do not have a "citizenship" for diversity purposes because they are, in essence, the State itself, and a State similarly has no citizenship that can be considered in determining if diversity jurisdiction exists. See, e.g., Hughes-Bechtol, Inc. v. West Virginia Bd. of Regents, 527 F.Supp. 1366, 1373 (S.D. Ohio 1981), aff'd 737 F.2d 540 (6th Cir. 1984). Penn National also does not and cannot dispute that these officials were named as defendants in the initial complaint and that, prior to the dismissal of that complaint, the Dispatch (after being permitted to intervene as an additional defendant) also named them as defendants to a cross-claim. That cross-claim pleaded that the Dispatch had made a proper request for the documents described in the complaint, that the Department of Commerce did not immediately produce all responsive documents, that the documents being withheld did not contain trade secrets, and that the Dispatch was entitled to a writ of mandamus directing that the documents be produced. The cross-claim also included a prayer for an award of costs and expenses, including

attorneys' fees.  <u>See</u> Notice of Removal, Doc. #1, Exhibit 5.

It is clear from the Notice of Removal itself that Penn National made no effort to obtain the consent of Messrs. Goodman and Williamson to the removal.  Instead, it asserted in the notice of removal, as it continues to assert in its briefing on the remand issue, that "[a]s a result of [the] voluntary dismissal [of the complaint], The Dispatch's Cross-Claim against the State Defendants is no longer viable" and that "the only parties remaining in the Declaratory Judgment Action are the intervening defendant, The Dispatch, and the counterclaim defendants Gaming Ventures and Penn."  Notice of Removal, Doc. #1, at ¶s 7 and 8.  Both the Dispatch and the State defendants contest the accuracy of that statement.

In its opposition to both motions to remand, Penn National argues that the cross-claim against the State defendants did not survive the dismissal of the complaint for injunctive relief. That is clearly true with respect to the Dispatch's claim for a writ of mandamus compelling the release of the documents, because they have now been released.  However, it is not so clear that the portion of the cross-claim that seeks an award of costs and attorneys' fees is similarly moot.

Penn National concedes that there is authority in Ohio supporting the proposition that the production of public records after the filing of a mandamus complaint, but prior to the issuance of a writ, does not necessarily moot an accompanying request for costs and fees.  In <u>State ex rel. Pennington v. Gundler</u>, 75 Ohio St.3d 171 (1996), the Ohio Supreme Court held that a court may award attorneys' fees to a party who has filed a mandamus action seeking release of public records even if the records are voluntarily produced, so long as the records request is "proper" - that is, as long as the underlying request was actually meritorious.  <u>See State ex rel. Ohio Patrolmen's</u>

Benevolent Assn. v. Mentor, 89 Ohio St.3d 440 (2000). But Penn National argues that the records in this case were actually exempt from disclosure because they contained trade secrets. It further argues that the sole reason that the State did not disclose the records (which it originally told the Dispatch it planned to do) was that the state court issued a TRO forbidding it to do so. Citing to State ex rel. Gannett Satellite Information Network, Inc. v. Petro, 81 Ohio St.3d 1234 (1998), Penn National asserts that attorneys' fees will not be awarded to a party requesting public records when the government agency involved withheld them only because of a court order. Thus, it contends that the Dispatch's request for attorneys' fees will not be granted by the state court and, consequently, "the State is not a proper party in this removal action." Opposition to the Motion of Ohio Department of Commerce and Division of Industrial Compliance and Labor to Remand Cross-Claim of the Dispatch Printing Company, Doc. #16, at 12.

The problem with Penn National's argument is that the conclusion it has reached does not follow from the premise it relies on. There is a significant difference between being named as a party to a lawsuit in which the claims will ultimately be found not to be meritorious, and not being a party at all. All of Penn National's arguments invite this Court to make a merits determination as to the attorneys' fees claim contained in the Dispatch's cross-claim, but were the Court to accept that invitation, it would be assuming the existence of jurisdiction to make a merits disposition - something the Court simply may not do. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998). A merits decision on the issues raised by the cross-claim must be made by the state court, not this Court.

It is true that there are situations where, in the context of removal jurisdiction, a federal court may make a judgment call

about the potential merits of a state law claim in determining whether to exercise jurisdiction. Most frequently, that occurs in the context of a claim of "fraudulent joinder," when the removing party argues that the citizenship of a non-diverse party must be disregarded because the sole purpose of that party's joinder was to defeat removal jurisdiction. In such cases, the federal court may assess the relative merits of the claim against the "fraudulently joined" party (but not, of course, adjudicate the merits of the claim) and may retain jurisdiction if the claim is so insubstantial that it does not present even a colorable claim under state law. See, e.g., Alexander v. Electronic Data Systems Corp., 13 F.3d 940, 949 (6th Cir. 1994).

Penn National has not couched its argument in precisely these terms, nor, it appears, could it have. When the cross-claim was asserted, the records had not been produced, and no determination had been made about their public nature other than the TRO which was issued the day the case was filed. Further, there is no indication that the Dispatch's purpose in asserting a cross-claim was to defeat removal jurisdiction; at the time it filed the cross-claim, the case was clearly not in a removable posture (and, for that matter, may still not be). Finally, the Dispatch is not the party who brought the State defendants into the litigation; Central Ohio Gaming did that. Consequently, this is not a case where the usual precepts of fraudulent joinder apply, and the Court will therefore not engage in the type of predictive adjudication of the merits of the cross-claim that is permitted in the typical fraudulent jointer situation.

The Court notes further that although Penn National argues, in that portion of its briefing devoted to the issue of "fraudulent misjoinder," that the Dispatch improperly asserted its counterclaim against both Central Ohio Gaming and Penn National in violation of Ohio's rules governing joinder of

claims, it makes no such argument about the cross-claim. Thus, there is no basis upon which the Court can either rule that the cross-claim lacks merit under Ohio law - and to make that determination, the Court would have to assume jurisdiction over the claim and then decide, as a matter of substantive law, that the records which were originally withheld either were or were not trade secrets - or determine that it is so likely that the claim will be found to be without merit that the Court should treat the State defendants as if they were not parties to the case. Even if a convoluted argument could be made that this is a case where the concepts underlying fraudulent joinder might apply, the burden would still be on Penn National to demonstrate that the Dispatch does not have even a colorable claim for attorneys' fees, and it has fallen far short of meeting that burden.

Thus, as it stands, this case was removed by a new counterclaim defendant which, even if it were to be realigned along with the original plaintiff as a defendant, would still be only one of four defendants in the underlying suit. Two of them did not, as required by 28 U.S.C. §1446, join in the removal, nor would be there be complete diversity because, as noted above, the State defendants do not count as "citizens" for diversity purposes. Consequently, the Court determines that, unless there is some other reason besides the arguable lack of merit to the cross-claim which would justify disregarding the State defendants' presence in this suit for jurisdictional purposes, removal was not proper. That leads directly to the fraudulent misjoinder argument.

## B. "Fraudulent Misjoinder"

Penn National's fraudulent misjoinder argument, as presented, assumes the Court will disregard the presence of the State defendants for the reasons which the Court has just

rejected.  Under that assumption, however, Penn National argues that if the Court were to realign the parties as it has suggested, Penn National would no longer be a counterclaim defendant without a right of removal.  Then, if the State defendants were treated as non-existent parties, it would have the right to remove the case because there would be complete diversity between the Dispatch, as plaintiff, and Penn National and Central Ohio Gaming, as the only real defendants.  However, the Court's determination that the State defendants remain parties, and that it is up to the state court, in the first instance, to determine if the remaining issue asserted in the cross-claim has merit, largely undercuts the fraudulent misjoinder argument, at least in the precise way Penn National has made it.  Nevertheless, it does not, for the following reasons, eliminate it altogether.

    The heart of Penn National's fraudulent misjoinder argument is that the Dispatch's counterclaim could not properly have been brought in the state court case because it does not relate to the claim made by Central Ohio Gaming against the State defendants.  A necessary corollary of that argument, however, is that it also does not relate to the Dispatch's cross-claim against the State defendants, because that cross-claim, which sought the release of the records in question, is simply an outgrowth of Central Ohio Gaming's claim that the records are exempt from public disclosure.  Thus, if the Court were to adopt Penn National's arguments about fraudulent misjoinder, it could disregard the State defendants' presence in the case not because the Dispatch has no valid claim remaining against them, but because the counterclaim should not have been joined with the cross-claim in the first instance.  If the Court were then to realign the parties so that the Dispatch became the sole plaintiff and all the other parties were defendants, and applied the fraudulent

misjoinder doctrine to determine that the claims against Penn National and Central Ohio Gaming were improperly joined to the cross-claim against the State defendants, that latter claim could be disregarded for removal purposes. The net result would be the conclusion that Penn National properly removed the case. Consequently, the Court must delve into the fraudulent misjoinder argument notwithstanding its determination that the State defendants continue to be parties to the case.

The first issue which the Court must confront is whether to recognize the fraudulent misjoinder doctrine at all. Although some courts (including one and perhaps two Courts of Appeals) have either developed or applied the doctrine, it is by no means universally accepted. As Penn National candidly acknowledges, Judge Frost of this Court, in <u>Bird v. Carteret Mortg. Corp.</u>, 2007 WL 894841 (S.D. Ohio March 22, 2007), expressed strong skepticism about the doctrine itself. Although Penn National tries to distinguish that decision on grounds that the misjoinder alleged there was not as "egregious" as the one present here, it is clear from a review of the decision that Judge Frost did not simply conclude that the doctrine was inapplicable to the particular facts of that case, but, rather, that it was not to be recognized at all.

In <u>Bird</u>, two Ohio plaintiffs asserted claims against two defendants, one of whom was also a citizen of Ohio for diversity purposes. The non-resident defendant removed the case, arguing that under both the fraudulent joinder and fraudulent misjoinder doctrines, the presence of the in-state defendant should be disregarded for jurisdictional purposes. In rejecting the latter argument, <u>Bird</u> described the fraudulent misjoinder doctrine as "less well-developed than the fraudulent joinder doctrine" and noted that it applied, if at all, "to situations where the complaint may state arguably viable claims against both the in-

state and out-of-state defendants, but there is no arguable basis for joining those claims together." Id. at *3. Bird also pointed out that only one Court of Appeals, the Eleventh Circuit, see Tapscott v. MS Dealer Service Corp., 77 F.3d 1353 (11th Cir. 1996), appears to have endorsed the doctrine wholeheartedly, and that subsequent district court decisions are relatively evenly divided on the question of whether the doctrine runs afoul of the need to construe removal jurisdiction strictly and to identify a particular statutory basis upon which Congress has authorized removal. Bird also expressed concern that although the doctrine does not authorize a federal court to decide the question of whether the joinder at issue was proper under state law, it does, like the fraudulent joinder doctrine, invite the removal court to characterize certain joinders of claims as "egregious" and to disregard an "egregious misjoinder" in determining whether removal was proper. One problem noted in Bird is that the courts subscribing to the doctrine "have not been able to craft a bright-line rule which distinguishes 'egregious' misjoinders from 'mere' misjoinders." Id. at *4. For a variety of reasons, Bird concluded that this doctrine had the potential to expand federal removal jurisdiction in ways that were "were neither wise nor warranted" and that "issues of state procedural law should not be determinative of, or even relevant to, issues of federal court jurisdiction in most instances ...." Id. at *5. Thus, to the extent that a party may have misused state joinder rules in a particularly egregious fashion in an effort to structure a case that is removal-proof, Bird concluded that the proper remedy would be to allow the state court to correct the problem by severing the claims, following which removal could occur.

Bird's approach has been explicitly adopted by at least one other District Judge in Ohio. See Geffen v. General Elec. Co., 575 F.Supp. 2d 865 (N.D. Ohio 2008) (Polster, J.). Geffen, like

Bird, also catalogs the split among district courts on this issue, and that division of authority holds true to this day. Additionally, Geffen relied both on Bird and on the "astute, insightful analysis" found in Rutherford v. Merck & Co., 428 F.Supp.2d 842, 851 (S.D. Ill. 2006), in reaching its conclusion that the fraudulent misjoinder doctrine represents an unwarranted and unauthorized expansion of federal removal jurisdiction.

The proper disposition of this issue is not reached, of course, by counting heads. Regardless of whether the number of districts which have adopted this doctrine in one form or another is slightly more, or slightly less, than those which have chosen the opposite path, the real question is whether the fraudulent misjoinder doctrine can be reconciled with the general and well-settled precepts surrounding removal jurisdiction and practice, including those which are derived from the fact that the grant of removal jurisdiction is statutory and that Congress' intent, as evidenced by the words it has elected to include (or not to include) in the removal statute is an important consideration. Cf. Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108 (1941), citing "the policy of the successive acts of Congress regulating the jurisdiction of federal courts [as] calling for the strict construction of such legislation."

The Court has given due consideration to the motivation behind the recognition of the fraudulent misjoinder doctrine, as articulated in the Tapscott case, and, like the courts in Bird, Geffen, and Rutherford, does not find that case persuasive. Tapscott built the rule around the same concepts which underlie the fraudulent joinder doctrine, namely that, as the Supreme Court recognized in Wilson v. Republic Iron & Steel Co., 257 U.S. 92 (1921), the right of removal should not be defeated simply by the joinder of an in-state defendant who has no real connection to the case. Tapscott's concern was that a plaintiff desiring to

-14-

defeat removal may, by joining (albeit incorrectly) a valid claim against a non-diverse defendant with a valid but totally unrelated claim against a diverse defendant, accomplish the same result produced by joining a frivolous (but related) claim against the non-diverse defendant with a valid claim against a diverse defendant.  In the latter situation, the courts, using the well-accepted fraudulent joinder doctrine, look through the form of the pleadings to their substance and disregard any claim which, as a matter of state substantive law, is patently insubstantial.  Why, then, should a joinder of two substantial claims which clearly do not belong together be treated differently?

The best answer to this question is, in this Court's view, that although efforts by in-state plaintiffs to preserve their perceived "home court" advantage by misusing state court rules concerning joinder of claims and parties are not looked upon with favor, Congress has intentionally not expanded the scope of removal jurisdiction to the full extent allowed either by Article III of the United States Constitution or the general jurisdictional statutes such as 28 U.S.C. §1331 and §1332.  There are classes of cases over which the federal courts would have original jurisdiction, had they been filed initially in a federal court, but which are not removable.  Ultimately, what types of cases may be removed to a federal court is a legislative decision, and the Court should give due respect to the fact that none of the statutes governing removal make any mention of "fraudulent misjoinder" as an exception to the rule that a case in which diversity of citizenship appears to be lacking may still be removed to and adjudicated by a federal court.

It is true that the fraudulent joinder doctrine is similarly not to be found in the removal statutes.  However, that doctrine has been well-established in removal jurisprudence for many

years, and Congress has amended the removal statutes on a number of occasions since the doctrine was first announced and while it was being applied in widespread fashion.  Congress could have, by statutory amendment, reversed that judge-made doctrine, but it has chosen not to do so, lending credence to the fact that Congress has acquiesced in that particular judicial construction of the removal statutes.

The same cannot be said of the fraudulent misjoinder doctrine.  It is new and not widely-accepted, and Congress would have no reason to think that it has become a well-established judicial gloss on the statute which either merits acceptance or, if Congress disapproves of it, calls for statutory reversal.  That fact, coupled with the desirability of predictable rules governing federal court jurisdiction and the admonition to construe the right of removal narrowly rather than expansively, persuades this Court that it would be, as Judge Frost has said, both unwise and unwarranted to create yet another exception to the statutorily-prescribed removal scheme, especially when the application of that doctrine relies on such an amorphous standard as "egregious misjoinder."

Additionally, there is no real need for such a doctrine.  If the joinder at issue is patently improper under state law, the diverse defendant should easily and quickly succeed in having the removable claim severed, at which point the case against the diverse defendant may properly be removed. See 28 U.S.C. §1446(b), which provides that "[i]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable ..."; see also Crump v. Wal-Mart Group Health Plan, 925 F.Supp. 1214, 1219 (W.D.

Ky. 1996).  Assuming that the joinder is egregiously improper, as the fraudulent misjoinder doctrine does, there would be little risk that the severance of claims would take so long that the one-year limitation on removal of diversity cases found in §1446(b) would preclude removal.  Conversely, if the joinder is proper under state law, or even arguably so, the state court could refuse to sever the claims.  While that would mean the case remains in state court, under the exact same circumstances, a federal court applying the fraudulent misjoinder doctrine would also conclude that the case was not removable.  Thus, no real purpose is served by creating and applying such a doctrine.

For all of these reasons, the Court concludes that it may not examine the propriety of the Dispatch's joinder of its counterclaim against Penn National and Central Ohio Gaming with its cross-claim against the State defendants for purposes of determining if the case was properly removed.  Thus, any realignment of the parties would not alter the fact that there is not complete diversity in this case, and that this Court lacks jurisdiction over the dispute in its present posture.  That being so, it is required to remand the case for want of jurisdiction. See 28 U.S.C. §1447(c).

## IV.  Conclusion and Order

For all of the above reasons, the Court **GRANTS** the motions to remand filed by The Dispatch Printing Company (Doc. #6) and the State Defendants (Doc. #12).  The Court **DENIES** the motion to realign parties (Doc. #11).  This case is **REMANDED** to the Court of Common Pleas of Franklin County, Ohio.

It is so ORDERED.

                                            s/James L. Graham
                                            JAMES L. GRAHAM
                                            United States District Judge

DATE: May 20, 2011